STATE OF CONNECTICUT    : 3:18mj59(JGM)    **FILED**

                              : ss: New Haven, Connecticut 2018 JAN 22 P 12: 07

COUNTY OF NEW HAVEN     : May 25, 2011    U.S. DISTRICT COURT NEW HAVEN, CT.

## SEARCH WARRANT AFFIDAVIT

I, Lynn E. Allen, being duly sworn, state as follows:

1.      I am a Special Agent of the U.S. Department of Labor, Office of Inspector General (DOL-OIG), and have been so employed since December 2003. Prior to joining DOL-OIG, I was a Special Agent with the U.S. Department of Agriculture, Office of Inspector General, for 6 years. My duties as a Special Agent include investigating violations of federal law, and more specifically as it pertains to this investigation, violations of Title 18, United States Code, Sections 1341, 1343, and 1033. While being trained as a Special Agent, I received basic investigative training on conducting fraud investigations at the Federal Law Enforcement Training Center in Georgia. I also received instruction on probable cause as it relates to search and seizure warrants, and the methods of executing such warrants. Additionally, in June 2007, I attended training on the criminal enforcement of violations of the Employee Retirement Income Security Act of 1974 (ERISA), which discussed fraud schemes involving employee benefit plans and Multiple Employer Welfare Arrangements (MEWA). I have assisted in the execution of numerous search warrants of personal residences and businesses for records relevant to ongoing fraud investigations. Through my training and experience as a Special Agent, I have become familiar with the manner in which individuals and entities prepare and maintain both personal and business records. I am currently assigned to the Meriden Field Office as a Senior Special Agent. I am the case agent that has directed the investigation that is the subject of this Affidavit,

in conjunction with an Investigator from U.S. Department of Labor, Employee Benefits Security Administration. I have participated fully in this investigation and, as a result of this participation, as well as the information provided by other investigators, I am thoroughly familiar with the information contained herein.

      2.     This affidavit is submitted in support of an application for a search warrant to: (a) search the entire premises of the office property located at 300 First Stamford Place, #201, Stamford, Connecticut ("SUBJECT OFFICE A"), which includes the sales and marketing business offices of Benistar Admin Services, Inc. ("BASI"), and other associated businesses, and is more specifically described below and in Attachment A; (b) search the entire premises of the office property located at 100 Grist Mill Road, Simsbury, Connecticut, ("SUBJECT OFFICE B"), which includes the main business offices of BASI, Charter Oak Trust, Charter Oak Trust 2009, Grist Mill Capital, LLC, Avon Capital, LLC, Nova Group, Inc, TPG Group, Inc., and other associated businesses, and is more specifically described below and in Attachment B; (c) search the entire premises of the office property located at 1055 Washington Boulevard, 8th Floor, Stamford, Connecticut, with entrance designated by the name "Caldwell Funding Corporation," ("SUBJECT OFFICE C"), which includes the offices of Caldwell Life Strategies, an entity associated with Ridgewood Finance II, LLC, the successor in interest of Ridgewood Finance, Inc., and is more specifically described below and in Attachment C; and (d) seize evidence, fruits and/or instrumentalities pertaining to violations of the fraud and related crimes set forth herein, as listed in Attachment D to this Affidavit. SUBJECT OFFICE A can be more specifically described as follows:

> Suite 201 of the office building located at 300 First Stamford Place, Stamford, Connecticut. First Stamford Place is a three-building, 810,000-square-foot multi-tenanted office complex, located off of Exit 7 on Interstate 95, adjacent to the Stamford Transportation Center. 300 First Stamford Place is a glass enclosed

office building located at the corner of Greenwich Avenue and First Stamford Place. The main entrance to the building has "300" over and to the right of the doorway. The elevators to access Suite 201 are on the Eastern side of the building. Suite 201 is on the second floor of the building, situated on the Northeastern side of the building. The office occupies approximately 7,200 square feet. The office entry is a large glass door. Listed on the glass in white letters are Benistar, Avon Capital and US Benefits Group. A photograph of the building entrance is attached as Exhibit 1.

SUBJECT OFFICE B can be more specifically described as follows:

The entirety of the premises located at 100 Grist Mill Road, Simsbury, Connecticut. 100 Grist Mill Road is a large, single story office building. The lower portion of the building consists of red brick and window, while the upper portion consists of horizontal gray siding. The property is accessed by a short driveway off of Grist Mill Road. At the bottom of the driveway is a red brick structure with a sign attached to it that says, "100 GRIST MILL ROAD." At the top of the driveway, as one approaches the parking lot, is a wooden sign that reads, "DIRECTORY, ENTRANCE 1, BENISTAR." There is no signage on the exterior of the building itself. A photograph of the office building is attached as Exhibit 2.

SUBJECT OFFICE C can be more specifically described as follows:

One of two suites on the 8th Floor of the office building located at 1055 Washington Boulevard, Stamford, Connecticut. 1055 Washington Boulevard is a nine story office building opposite of Whitaker Place with an attached parking garage. SUBJECT OFFICE C has its entrance on the east side of the building, facing west. The entrance to SUBJECT OFFICE C is wooden, with a glass partition next to it bearing the name "Caldwell Funding Corporation."

3.      This affidavit is also in support of an application for warrants to seize and then search forensic images of certain computer drives and media ("TARGET SEIZED MEDIA") that were previously seized pursuant to a search warrant for SUBJECT OFFICE B on April 20, 2010, and which are currently held by the Internal Revenue Service-Criminal Investigative Division (IRS-CID) at 150 Court Street, Room 314, New Haven, Connecticut, more specifically described as follows:

a.      RAID ARRAY in a Dell Power Edge 2600, with Serial Number 722PB51, IRS Control Number B71 

      b.     RAID ARRAY in a Dell Server, with Serial Number 7YTNQB1, IRS Control Number B72

      c.     Dell D600 Laptop Computer, Seized from Cube Number 38, IRS Control Number B73

      d.     Dell D800 Laptop Computer, Service Tag 1FRKG61, IRS Control Number B74

      e.     Dell D610 Laptop Computer, Service Tag DQ21981, IRS Control Number B75

      f.     USB Thumb Drive, Seized from Cube 33, IRS Control Number B76

      g.     Adaptec External Drive, IRS Control Number B77

      h.     Hard Disk Drive in Dell Optiplex Computer, Seized from Daniel Carpenter's Office, Service Tag GG7Z551, IRS Control Number B78

      i.     Hard Disk Drive in Dell Latitude Computer, Seized from Daniel Carpenter's Office, Service Tag HF95K11, IRS Control Number B79

      j.     Dell Optiplex Desktop Computer Model GX520, Seized from Molly Carpenter's Office, Service Tag 424PL91, IRS Control Number B80

      k.     Dell Latitude D830 Computer, Seized from Cube 34, IRS Control Number B81

      l.     Generic computer drive in an Antec Box labeled "Benistar 508", IRS Control Number B82

      m.     Dell Latitude 630 Computer, IRS Control Number B83

4.     The purpose of the searches is to look for and seize evidence that Daniel Carpenter, Wayne Bursey, J. Edward Waesche, Jack E. Robinson, Charles Induddi Westcott,

Robert Pacini, Andrew Varner, Paul E. Martin, Donald Trudeau, and others known and unknown (collectively the "TARGETS"), are committing or have committed violations of federal law, including the following:

      a.      Evidence of wire fraud, in violation of 18 U.S.C. Section 1343;

      b.      Evidence of mail fraud, in violation of 18 U.S.C. Section 1341;

      c.      Evidence of insurance fraud by in violation of 18 U.S.C. Section 1033; and

      d.      Fruits, instrumentalities, and proceeds of the above criminal violations.

5.      The information contained in this affidavit is based on, among other information, the following:

      a.      Information obtained during interviews of witnesses, including information obtained from company officials who may have been defrauded by the TARGETS;

      b.      Information and documents obtained from numerous life insurance companies, regarding the life insurance policies held under the Charter Oak Trust and/or Charter Oak Trust 2009;

      c.      Analysis of numerous bank accounts associated with the Charter Oak Trust, Carpenter, Bursey, Trudeau, Robinson, Westcott and Waesche and business entities associated with them, including The Nova Group, Inc., TPG Group, Inc., Grist Mill Capital, LLC, and Avon Capital, LLC;

      d.      My personal knowledge and involvement in the investigation, including information obtained as the result of the review of records pertaining to Carpenter, Bursey, Trudeau, Robinson, Pacini, Martin, Varner, Westcott and Waesche, official government records checks, and public records checks; and

      e.      My training and experience as a criminal investigator, in conjunction with the training and experience of other investigators involved in the case, including Investigator Mary Goreham of the U.S. Department of Labor, Employee Benefits Security Administration.

6.      Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested search warrant, it does not include all information gathered to

date by the DOL-OIG in relation to this investigation. Rather, it contains information that I

believe establishes probable cause to believe that evidence, instrumentalities and fruits of federal

criminal violations committed by the TARGETS are located at SUBJECT OFFICE A, SUBJECT

OFFICE B, and SUBJECT OFFICE C, and in the TARGET SEIZED MEDIA.

7.      Based on the facts described below, there is probable cause to believe that:

        a.      The TARGETS caused the U.S. Mail to be used in furtherance of a
scheme to defraud insurance companies, including but not limited to the submission of
false insurance applications, in violation of 18 U.S.C. Section 1341;

        b.      The TARGETS caused the use of interstate wires in furtherance of the
same scheme to defraud insurance companies, including but not limited to the use of
email in the submission of false information in support of fraudulent insurance
applications, in violation of 18 U.S.C. Section 1343;

        c.      The TARGETS have caused the submission of false insurance
applications to insurance companies by misrepresenting pertinent information on the
applications, in violation of 18 U.S.C. Section 1033; and

        d.      The items sought in Attachment D will be found at the SUBJECT OFFICE
A, SUBJECT OFFICE B, and SUBJECT OFFICE C, and in the TARGET SEIZED
MEDIA.

## PART I.  RELEVANT PERSONS AND LOCATIONS

8.      Benistar Admin Services, Inc. ("BASI"), is an administrator of health and welfare

benefit plans. BASI has numerous related entities, including Charter Oak Trust, Charter Oak

Trust 2009, Grist Mill Capital, LLC, Avon Capital, LLC, Nova Group, Inc., TPG Group, Inc.,

Benefit Plan Advisors, LLC, Grist Mill Holdings, LLC, the Charter Oak Trust Welfare Benefit

Plan, and Caroline Financial Group, Inc. (collectively, the "SUBJECT COMPANIES").

9.      The Charter Oak Trust ("COT") was declared effective October 1, 2006, as a

multiple employer trust providing death benefits to certain covered individuals. According to the

COT Declaration of Trust, the Trust is administered in conformity with all rules under Sections 419 and 419A of the Internal Revenue Code of 1986.

      10.     One version of the COT Trust Declaration lists Grist Mill Capital, LLC as the Plan Sponsor and Administrator. The Declaration is signed by Jack E. Robinson ("Robinson") as Manager of Grist Mill Capital, LLC.

      11.     Another version of COT Trust Declaration lists Nova Group, Inc., as the Plan Sponsor and Administrator.  The Declaration is signed by Wayne Bursey ("Bursey") as President of Nova Group, Inc.

      12.     A Declaration of Trust for "Charter Oak Trust 2009" ("COT 2009") was executed January 2, 2009, and listed Nova Group, Inc., as the Plan Sponsor.  The declaration bears the signature of Bursey as President of Nova Group, Inc.

      13.     The Limited Liability Company Operating Agreement for Grist Mill Capital, LLC, entered into on November 22, 2006, lists the address for Grist Mill Holdings, LLC and Caroline Financial Group, Inc, as 100 Grist Mill Road, Simsbury, Connecticut (SUBJECT OFFICE B).  Grist Mill Holdings, LLC has 98% capital interest in Grist Mill Capital, LLC. Caroline Financial Group, Inc. and Robinson each have a 1% capital interest. Robinson's address is listed as 2187 Atlantic Street, Stamford, Connecticut.

      14.     The Limited Liability Company Operating Agreement for Avon Capital, LLC, entered into on November 22, 2006, lists the address for Grist Mill Capital, LLC as 100 Grist Mill Road, Simsbury, Conecticut (SUBJECT OFFICE B).  Grist Mill Capital, LLC has 100% capital interest in Avon Capital, LLC.

      15.     The Secretary's Certificate related to the credit agreement between Ridgewood Finance, Inc., and Grist Mill Capital, LLC and Avon Capital, LLC, dated November 29, 2006, is

signed by Bursey and Robinson as managers. On the Secretary's Certificate, Robinson, Bursey, Donald Trudeau ("Trudeau"), Daniel Carpenter ("Carpenter"), Guy Neumann and Amanda Rossi are authorized to request an advance under the credit facility maintained at Ridgewood.

16.      A September 1, 2009, premium notice from Penn Mutual Insurance for a payment on the Theresa Martinez insurance policy, held by the COT and discussed at length below, listed the insurance agent as J.E. Waesche (full name Joseph Edward Waesche, hereinafter "Waesche"), Nova Benefit Plans, 2187 Atlantic Street, 9th Floor, Stamford, Connecticut.

17.      A Press Release dated March 23, 2010, states that Benistar moved its sales and marketing offices from 2187 Atlantic Street, Stamford, Connecticut, to 300 First Stamford Place, Stamford, Connecticut. The press release also mentions Benistar's corporate headquarters, located in Simsbury, Connecticut.  In or about February 2011, your affiant visited 2187 Atlantic Street in Stamford, Connecticut, and there is no listing for any of the SUBJECT COMPANIES in that building.

18.      A June 10, 2010 premium notice sent from Penn Mutual Life Insurance for a payment on a COT policy in the name of Patricia Biermaier listed the insurance agent as Waesche, at Nova Benefit Plans, Suite 201, 300 First Stamford Place, Stamford, Connecticut (SUBJECT OFFICE A).

19.      On April 8, 2011, at approximately 9:00 a.m., your affiant entered 300 First Stamford Place, Suite 201 (SUBJECT OFFICE A). The door to Suite 201 listed Benistar, Avon Capital and US Benefits Group.  The office was furnished and appeared to be operational.

20.      According to Connecticut Secretary of State business records, Avon Capital, LLC, was incorporated in 2006, with an address of 100 Grist Mill Road, Simsbury, Connecticut (SUBJECT OFFICE B)

21.     Bank records for the SUBJECT COMPANIES show an address of 100 Grist Mill Road, Simsbury, Connecticut (SUBJECT OFFICE B).

22.     Your affiant has interviewed an individual who visited SUBJECT OFFICE A, 300 First Stamford Place, Suite 201, Stamford, Connecticut, in the fall of 2010, for the purpose of meeting with Trudeau and viewing insurance policies owned by the Charter Oak Trust and/or Charter Oak Trust 2009.

23.     On October 7, 2010, Veronica Cranny and Dana Diorio of Ridgewood Finance II, submitted a letter to Christiana Bank detailing the settlement agreement between Ridgewood Finance II (successor of Ridgewood Finance) and Grist Mill Capital, LLC, Avon Capital, LLC, Charter Oak Trust, and Avon Insurance Trust.   The settlement was effective September 30, 2010.  In the letter, the address is listed as 1055 Washington Blvd, 8th floor, Stamford, Connecticut. The letterhead is "Caldwell Life Strategies."

24.     On May 23, 2011, at approximately 12:45 p.m., your affiant visited the 8th floor of 1055 Washington Boulevard.  SUBJECT OFFICE C had its entrance on the east side of the building, facing west.  The door was wooden with a glass partition to the right, with the designation "Caldwell Funding Corporation."  The office appeared to be furnished and operational.

## PART II.  BACKGROUND OF WELFARE BENEFIT TRUSTS AND STRANGER ORIGINATED LIFE INSURANCE POLICIES

### *Welfare Benefit Plans*

25.     The U.S. Department of Labor ("DOL"), through the Employee Benefits Security Administration ("EBSA") is responsible for the administration and enforcement of the provisions of Title I of the Employee Retirement Income Security Act (ERISA).  ERISA regulates, among other programs, employee welfare benefit plans, as defined in 29 U.S.C. § 1002(1).  ERISA also prescribes standards of fiduciary conduct that apply to persons responsible for the administration and management of plan assets.

26.     An employee welfare benefit plan, as it applies to the subject of this Affidavit, is defined in ERISA in part as "any plan, fund, or program...established by an employer...for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, disability [or] death...benefits."

27.     Typically, under ERISA and as it applies to this Affidavit, a single employer welfare benefit plan is comprised of a single employer which purchases life and disability insurance for the benefit of individual employees. The individual employee is then entitled to name one or more beneficiaries for any death benefit provided.

28.     In certain circumstances, ERISA also regulates MEWA's.  A MEWA is an employee welfare benefit plan or other arrangement that is designed to provide benefits to the employees of two or more employers.  An adopting employer then may purchase insurance through the MEWA for the benefit of that employer's employees and their beneficiaries, while the MEWA sponsor or promoter may manage or administer the actual plan on behalf of the adopting employers.

29.     Employer welfare benefit plans are regulated by Sections 419 and 419A of the Internal Revenue Code of 1986. Section 419 covers the treatment of funded welfare benefit plans. In that section, a welfare benefit fund is defined as "any fund which is part of a plan of an employer, and through which the employer provides welfare benefits to employees or their beneficiaries."

### Stranger Owned Life Insurance

30.     In recent years, a market for life insurance has formed in which existing life insurance policies are sold to third parties for investment purposes, often in the form of so-called "life settlement funds." These third parties have no insurable interest in the life of the insured, but these sales are generally lawful, as long as the policy was originally obtained for a legitimate purpose and there was an insurable interest at the time of the policy's origination.

31.     However, as the market for the sale of policies to third parties has grown, insurance policies have been procured with the sole intent to have third party investors purchase the policies. Policies obtained in this way are known as stranger originated life insurance ("STOLI") policies. STOLI policies are prohibited by law in many states as a matter of public policy, in that the purchaser of the insurance policy lacks any interest in the insured life at the time of origination. Moreover, regardless of the relevant state laws, insurance companies will typically not issue STOLI policies, and in all cases will carefully review applications and other paperwork to ensure that the policies they sell are not STOLI.

32.     Notwithstanding legal bars or insurance company prohibitions, certain individuals have developed schemes by which they attempt to purchase STOLI policies and then sell them for profit. To conceal the existence of a STOLI policy, the application process is sometimes initiated with fraudulent representations on the application and the associated paperwork. (FN)

Insurance applications typically ask specific questions about the purpose of obtaining the policy and the means by which the premiums will be funded. STOLI promoters will answer these questions falsely to conceal that the policy is for outside investment purposes and the premiums will be funded by a third party with no insurable interest. STOLI promoters will also often falsify information regarding the insured's financial status. Inflating an insured's financial assets allows for a larger value on the life insurance policy, maximizing the investment for the STOLI promoter.

33.     Typically, the sale of a STOLI policy to investors is completed at least two years following the policy's origination. Within the first two years of the policy's existence, the insurer has the ability to challenge civilly any fraud in the origination of the policy. After that "contestability period," it becomes very difficult to challenge such fraud.

### PART III.  SUMMARY OF INVESTIGATION CONCERNING THE FRAUDULENT SCHEME INVOLVING THE CHARTER OAK TRUST and THE CHARTER OAK TRUST 2009

34.     Over the last several months, your affiant has been conducting an investigation into a STOLI scheme being operated by Carpenter, Bursey, Waesche, Robinson, Pacini, Varner, Martin, Westcott and Trudeau, and others known and unknown (collectively, the "TARGETS"). In short, the investigation has revealed a pattern of activity by the TARGETS whereby the following has occurred: (1) the TARGETS or their associates solicit individuals at least seventy years of age (the "insureds") to purchase life insurance policies through Charter Oak Trust or Charter Oak Trust 2009; (2) the TARGETS submit on behalf of the insureds applications for insurance policies which make materially false representations regarding such items as the source of premiums, the net worth and income of the insureds, the goals of the policy, and/or the insureds' employment status; (3) the TARGETS compensate the insureds through cash payments

and/or through providing the ability to name a beneficiary within the two year contestability period of the insurance policy;  and (4) following the 2 year contestability period, the TARGETS have sold many of the policies to life settlement funds or other third party investors.

35.      The evidence to date has also revealed that because Charter Oak Trust and Charter Oak Trust 2009 operate under Internal Revenue Code Section 419, which requires that the insured be an employee of an adopting company, it appears that the TARGETS or their associates may arrange to register non-existent businesses specifically for the purpose of securing life insurance on an insured.

### The Creation of Charter Oak Trust

36.      In October 2006, the Charter Oak Trust Welfare Benefit Plan (the "Plan") was established.  According to the Declaration of Trust, The Plan provides death benefits to employees of employers who adopt the Plan.  Plan benefits are provided through the Charter Oak Trust.

37.      The Declaration of Trust for the Charter Oak Trust states that it is a multiple employer trust that conforms with all rules under Sections 419 and 419A of the Internal Revenue Code of 1986. Through documents subpoenaed from insurance companies and banks, your affiant has discovered two versions of the Declaration of Trust.  One states that Grist Mill Capital, LLC, is the Plan Sponsor, Administrator and Trustee. The other states that Nova Group, Inc., is the Plan Sponsor, Administrator and Trustee.

38.      In September 2009, the law office of Wormser, Kiely, Galef & Jacobs issued a legal opinion letter regarding the Plan.  The letter states that the Plan is a 'multiple employer welfare benefit fund as described in Section 419(e) of the Internal Revenue Code…that provides fully insured death benefits to covered employees…of a participating employer." The letter

13

indicates the Plan Sponsor is Nova Group, Inc.  The letter further indicates that Employers must contribute to the Trust an amount sufficient to cover the cost of benefits, that benefits terminate upon a covered employee's termination of employment, and that an Employer's withdrawal from the Trust allows for the transfer of life insurance policies for that Employer's Employees.

39.     Grist Mill Capital, LLC has a bank account at Christiana Bank & Trust Company ("Christiana"), and numerous Adoption Agreements were submitted to Christiana for the employers of the insureds.  These Adoption Agreements state that the Employer accepts the Charter Oak Plan & Trust and agrees to remit all contributions to the Plan Administrator.

40.     Charter Oak Trust submitted life insurance applications to numerous life insurance companies on behalf of insureds.  These applications typically stated the net worth of the insureds to be in the millions of dollars.  The applications also typically stated the insurance was being sought for legacy or estate planning and that the premium payments were not financed by a third party.

41.     Although documents submitted to life insurance companies and Christiana stated that Charter Oak Trust was a MEWA and premiums would be employer funded, Avon Capital, LLC and Grist Mill Capital, LLC, entered into a Line of Credit and Security Agreement (the "Agreement") dated November 22, 2006 with Ridgewood Finance, Inc., to fund the premium payments for these policies.  Robinson, as Manager, signed the Agreement on behalf of Avon Capital, LLC and Grist Mill Capital, LLC.

42.     On November 22, 2006, Robinson signed a Line of Credit Grid Promissory Note as Manager of Grist Mill Capital, LLC, and Member/Manager of Avon Capital, LLC.  The Line of Credit from Ridgewood Finance, Inc is $35,000,000, to be repaid by Grist Mill Capital, LLC and Avon Capital, LLC, with 10% interest.

14

43. On February 12, 2007, Robinson signed an Amended and Restated Line of Credit Grid Promissory Note as Manager of Grist Mill Capital, LLC, and Avon Capital, LLC. The Line of Credit from Ridgewood Finance, Inc is $35,000,000, to be repaid by Grist Mill Capital, LLC and Avon Capital, LLC, with interest not to exceed 16%.

44. Commitment letters between Grist Mill Capital, LLC, and Ridgewood Finance, Inc., list the maturity date for the loans as either 27 months from the first advance or 27 months from the effective date of the insurance policy. These commitment letters are signed by an underwriter for Ridgewood Finance, Inc., and by Carpenter, for Grist Mill Capital, LLC.

45. For policies within the Charter Oak Trust, there is a Disclosure, Acknowledgement & Certification Agreement between the insured, the insurance agent, and Grist Mill Capital, which states that Grist Mill Capital, LLC, will provide plan funding in relation to the acquisition of benefits through the Charter Oak Trust. Your affiant is unaware at this time of these agreements being provided to insurance companies.

46. Grist Mill Capital, LLC either took funds from their line of credit with Ridgewood Finance, Inc. or from their own assets to pay premium payments for individuals. Premium payments for policies within the Charter Oak Trust were made from an account at PNC Bank. A review of the Grist Mill Capital account at Christiana shows deposits from Ridgewood Finance into the account and withdrawals from the account to the Charter Oak Trust account at PNC Bank. Other deposits came from entities associated with Grist Mill Capital and Charter Oak Trust. No deposits were made from any alleged employer of an insured within the Charter Oak Trust.

47. To date, your affiant has reviewed approximately eighty policies originated through the Charter Oak Trust or Charter Oak Trust 2009. Of those policies

     a.     All eighty include declarations to their respective insurers that the premiums will not be financed through third parties.  In fact, records reveal that *all* of them are financed by third parties;

     b.     All eighty policies insure individuals who are seventy years or older;

     c.     Your affiant has to date investigated the adopting employers in fifty-six of them.  Of those adopting employers, seventeen of them were formed within one year prior to the origination of the insurance policy purchased.  Further investigation is being conducted to learn whether the businesses ever actually carried on activities and whether the insureds were bona fide employees.  However, records reveal that none of the employers paid premiums for the insureds, as is required under IRS Code Section 419;

     d.     Seventy-one of the eighty policies reviewed have recently passed their 2 year contestability period.  Of those, thirty-five have already had their ownership transferred.  Further records are being requested to determine the disposition of the remaining policies.

### Specific Insurance Policies

48.     This section details certain examples among the 80 policies reviewed by your affiant that demonstrate specifically how the fraud operated.

*Miriam Knobloch Policy*

49.     Penn Mutual Life Insurance Company received a life insurance application for insured Miriam Knobloch within the Charter Oak Trust, signed June 30, 2008. Knobloch's annual earned income is listed as $100,000. Her other income is stated to be $700,000 in "interest income, dividends and capital gains" and her net worth is listed as $15 million. The application additionally states that no part of any premium will be paid from funds that are

16

borrowed or otherwise financed. The sources of the funds are shown to be Trust assets and the reason for insurance is listed as "Estate Planning." The application bear signatures in the names of Knobloch, Bursey and Waesche. Attached to the application is an Agent's Underwriting Report, which also lists the specific need for the insurance coverage as "estate tax liquidity, wealth transfer." This form is signed by Waesche.

50.     On July 2, 2008, Waesche sent an email to Tom Webb of Penn Mutual regarding Miriam Knobloch.  In the email, Waesche provides details of Knobloch's financial status and states that "because their estate is primarily comprised of real estate, the illiquid nature of real property will result in an extraordinary amount of estate taxes due at the time of her death."  He further states, "Miriam and her husband...agreed that providing death benefit protection through a welfare benefit DBO plan fit in best with their...objectives."

51.     On September 19, 2008, an Application Amendment was signed by Knobloch, Waesche and Bursey and sent to Penn Mutual.  The Amendment asks, "Will any part of the premium be paid from funds that are borrowed or otherwise financed?"  The answer on the form is NO.

52.     Christiana Bank received an Adoption Agreement from R&M Enterprises, LLC, on behalf of employee Miriam Knobloch.  The agreement bears a signature in the name of Knobloch as the Authorized Representative of the employer.  The agreement was executed on September 4, 2008.

53.     Searches of business databases and state Secretary of State records located one business by the name of R&M Enterprises, LLC, registered in New York State; however, the address associated with the R&M Enterprises adoption agreement and the Knobloch policy

17

documentation is different than that of the registered business, and there appears to be no connection between Knobloch and the R&M Enterprises in New York.

54.     A Disclosure, Acknowledgement & Certification Agreement dated September 4, 2008, bears signatures in the names of Knobloch and Waesche. Carpenter accepted and agreed to the agreement for Grist Mill Capital, LLC, on September 22, 2008.

55.     In a Commitment Letter dated July 29, 2008, Ridgewood Finance agreed to fund a premium finance loan in the amount of $260,926.83 to Grist Mill Capital to be used towards payment of premiums on Miriam Knobloch's life insurance policy with Penn Mutual Life Insurance Company. Per the commitment letter, the annual interest rate is 12% and the maturity date on the loan is 27 months from the policy effective date.

56.     On September 3, 2008, $219,900 was deposited into the Grist Mill Capital Christiana account from a Ridgewood Finance Inc account at JP Morgan Chase Bank and was wired out the same day to the Charter Oak Trust account at PNC Bank. On September 4, 2008, $219,900 was wired out from the Charter Oak Trust account at PNC Bank and sent to Penn Mutual Life Insurance for payment of Miriam Knobloch's life insurance premium.

**Thomas Knowles Policy**

57.     Phoenix Life Insurance Company received a life insurance application for insured Thomas Knowles within the Charter Oak Trust, signed March 14, 2007. Knowles' annual earned income is listed as $100,000. His other income is listed as $50,000 and his net worth is listed as $2.5 million. The application states the premiums will not be paid through non-recourse premium financing. It also states that no method is being utilized to pay premiums in order to facilitate a current or future transfer, assignment or other action. The application is signed by Knowles, Bursey and Waesche. Attached to the application is a Producer's Report, which also

lists Knowles' net worth and income. The Producer's report states the insurance need is "Income Replacement" and "Estate Liquidity." The report also asks if there is any intention that any company other than the Owner will obtain any right, title or interest in any policy issued on the life of the Proposed Life Insured as a result of this application. The answer given is NO. This form is signed by Waesche.

58.     The policy packet for Phoenix also contains a Statement of Client Intent, bearing signatures in the names of Knowles, Bursey and Waesche. This statement asks if any of the first year or subsequent premiums for the policy will be borrowed by the proposed owner or proposed insured or by any other individual, trust, partnership, corporation or similar or related entity. The answer provided is NO. The Source of Funding is listed as "Other Assets: Trust." The form also states that there is no formal or informal program under which there will be an opportunity to transfer ownership to a third party and that there is no understanding providing for a party other than the owner to obtain any legal or equitable right, title or interest in the policy. The "Bona Fide Insurance Need" listed is "Estate Planning."

59.     Included in the policy packet is a memorandum from Waesche. The memo reiterates Knowles' net worth, from "real estate, cash and cash equivalents." Waesche states Knowles "has earned income from his real estate (broker) practice of $100,000." Waesche further states that "This new coverage…will be used to provide the liquidity necessary to pay the estate taxes due at the time of his death and, to provide additional (lump sum) funds to replace the lost income should he not survive his wife…"

60.     On May 14, 2007, EMSI, a company contracted by Phoenix to confirm application information with insureds, spoke to Knowles about his application. Knowles stated he was self-employed as a real estate broker with Kearney Real Estate. Knowles claimed an

annual earned income in "excess of $150,000" and an estimated net worth of $3 million.

Knowles claimed that no policy premiums would be borrowed, the purpose of the coverage was

for life insurance and he received no financial inducement in connection with the policy.

61.    Christiana Bank received an Adoption Agreement from TLK Enterprises, LLC,

on behalf of employee Thomas Knowles.  The agreement bears a signature in the name of

Knowles as the Authorized Representative of the employer and the agreement was executed on

July 25, 2007.

62.    A review of Florida Department of State records showed TLK Ventures, LLC,

incorporated on August 7, 2007. Knowles is listed as the manager and the address is 4776

Hodges Boulevard, 105, Jacksonville, Florida. The business became inactive as of September 26,

2008, and has remained inactive. Three weeks after TLK Ventures was incorporated, a business

for another insured within Charter Oak Trust, EJL Partners, LLC, was incorporated.  EJL

Partners shared the same address as TLK Ventures and also became inactive in September 2008.

An online search brings up no information about TLK Ventures or EJL Partners, but does show

that the relative of yet another insured within the Charter Oak Trust, David Siewert, has property

at 4776 Hodges Blvd, 105, Jacksonville, Florida.

63.    A Disclosure, Acknowledgement & Certification Agreement dated March 14,

2007, bears signatures in the names of Knowles and Waesche.  The bottom of the form also

indicates that it was "accepted and agreed to" by Daniel Carpenter as "Chairman of Managing

Member," and bears a signature in Carpenter's name.

64.    In a Commitment Letter dated August 9, 2007, Ridgewood Finance agreed to

fund a premium finance loan in the amount of $251,369.91 to Grist Mill Capital to be used

towards payment of premiums on Thomas Knowles' (listed only as "KT" on the letter) life

insurance policy with Phoenix Insurance Company (listed as PHL Variable Insurance Company on the letter). Per the commitment letter, the annual interest rate is 12% and the maturity date on the loan is 27 months from the first advance date.

65.     On August 16, 2007, $115,441.00 was deposited into the Grist Mill Capital Christiana account from a Ridgewood Finance, Inc., account at JP Morgan Chase Bank and was wired out the same day to the Charter Oak Trust account at PNC Bank. On the same date, $115,441.00 was wired out from the Charter Oak Trust account at PNC Bank and sent to Phoenix Life Insurance for payment of Thomas Knowles' life insurance premium. On July 11, 2008, $104,251.00 was deposited into the Grist Mill Capital Christiana account from a Ridgewood Finance, Inc., account at JP Morgan Chase Bank, was wired out the same day to the Charter Oak Trust account at PNC Bank and then was sent from PNC Bank to Phoenix Life Insurance for payment of Knowles' premium. On July 24, 2008, $16,500.00 was deposited into the Grist Mill Capital Christiana account from a Ridgewood Finance, Inc., account at JP Morgan Chase Bank, was wired out the same day to the Charter Oak Trust account at PNC Bank and then was sent from PNC Bank to Phoenix Life Insurance, again for payment of the Knowles premium.

**George Sanders Policy**

66.     On July 23, 2008, Jenny Valedaserra of Benefit Plan Advisors, 100 Grist Mill Road, Simsbury, Connecticut, faxed a life insurance application for insured George Sanders to the Premier Partner Underwriting section of Lincoln. The application stated that Sanders' employer was George D. Sanders Interests, LLC and Sanders was a Consultant for the business. The application also reported that Sanders' annual earned income was $200,000, annual unearned income was $2,000,000 and his net worth was $25,228,000. The application asks if

either the proposed insured or the proposed owner has been involved in any discussion about the possible sale or assignment of this policy. The answer provided is NO. The application also asks both the proposed insured and the proposed owner if the policy is being funded via a premium financing loan or with funds borrowed, advanced or paid from another person or entity. This is also answered NO. The application is signed by Sanders, Bursey and Robert Pacini, the original agent on the application.

67.    Included with the application packet is an Agent's Report. On the Report, the purpose of Sanders' insurance is listed as "Estate Planning." The Report asks if the policy is being paid with a premium financing loan and the answer provided is NO. The Report also asks if the policy is being paid for with funds from any person or entity whose only interest in the policy is the potential for earnings based on the provision of funding for the policy. The answer provided is NO. The agents who participated in the application are listed as Pacini (with 25% commission), Westcott (listed as Charles J. Induddi, with 50% commission) and Brad Kellam (with 25% commission). The Report bears a signature in the name of Pacini, and is dated June 30, 2008.

68.    Included with Sanders' application packet to Lincoln is a Required Producer & Representative Certification Regarding Investor Owned Life Insurance form. The form asks if any premium financing has been contemplated to pay the initial or future premiums for this policy. The answer provided is NO. The form also asks if the agent is aware of any business or financial relationship between the trustee or entity managers and any premium financing, life settlement, viatical or other secondary market provider. The answer provided is NO. This form bears a signature in the name of Pacini with the date June 30, 2008, and a signature in the name of Westcott with the date July 1, 2008.

69.     Included with the application packet for Sanders is an Acknowledgement for Single-Employer 419(e) Welfare Benefit Plans.  This form is signed by Sanders and Bursey.

70.     On May 16, 2008, Articles of Organization for George D. Sanders Interests, LLC, were sent to the Texas Secretary of State by attorney Paul Martin.  Martin's address on the correspondence is the same as Pacini's address.  On December 7, 2009, the Texas Secretary of State received a Certificate of Termination for George D. Sanders Interests, LLC. There was no other information received regarding this business.

71.     Some policies within the Charter Oak Trust were not financed through Ridgewood, but were financed through businesses associated with Grist Mill Capital, LLC.  For example, on November 20, 2009, Lincoln received a premium payment of $61,925.00 for a Sanders' policy from the Charter Oak Trust account at PNC Bank.  On October 27, 2009, $61,925.00 was deposited into the Charter Oak Trust Account at PNC Bank from the Avon Capital, LLC, account at TD Bank North.  That money was a portion of a $333,000 deposit on October 27, 2009, from a Grist Mill Capital, LLC, account at TD Bank North.  The $333,000 deposit was a portion of a October 27, 2009 deposit of $19,800,000 into the Grist Mill Capital, LLC, account, from the Charter Oak Trust account at TD Bank North. The $19,800,000 was a portion of a May 18, 2009, deposit of over $30,000,000 from Lincoln, which was the payment of a death benefit on another Charter Oak Trust policy.

**Teresa Martinez Policy**

72.     On June 18, 2008, Waesche sent an application packet for insured Teresa Martinez to the Penn Mutual Life Insurance Company.  On the application, Martinez is listed as "semi-retired."  The application states Martinez works for herself as a charitable fund organizer. Martinez's annual earned income is listed as $21,000 and her other income is $300,000.  Her net

worth is listed as $7.4 million.  The description for the source of her other income is, "interest income, dividends and cap gains from trust assets." The source of funds for Martinez's policy is listed as Trust Assets and the need for insurance is "Estate Planning" and "Death Benefit." Questions about premium financing or the possible sale of the policy are answered NO.  The application is signed by Bursey.

73.     An agent's underwriting report was included in the application packet. The specific need for insurance coverage is listed as estate tax liquidity. Questions about premium financing and sale of the policy are answered NO. The report was signed by Waesche, agent on the policy, receiving 100% commission.

74.     In a cover letter for the application packer, Waesche sent a memorandum to Penn Mutual regarding Martinez. The memo states that Martinez has started local chapters of various organizations, including Meals on Wheels and the Salvation Army; that her net worth is approximately $7.4 million, which includes cash, real estate holdings, stocks and corporate bond; that the life insurance would be used to provide financial security and prevent the liquidation of her business investments due to a sizable tax liability Martinez faces upon her death; that the source of the premium payments is "the income, dividends and interest from Teresa's trust assets."  Waesche also discusses Martinez's estate growth prior to her death, stating that Martinez's estate will grow to approximately $14.6 million, resulting in a tax liability of approximately $7.6 million.

75.     A Confidential Financial Statement was included with Martinez's application packet.  The statement lists estate conservation as the purpose for life insurance. Martinez's total annual income is listed at $321,000 and her net worth is listed as $7.5 million, including over $7 million in investments.  Martinez allegedly signed this form on May 23, 2008.

76.     On September 3, 2008, Waesche sent an email to Penn Mutual and attached financial statements for Martinez.  CPA William Klein submitted a letter and financial statement concerning Martinez.  Klein lists Martinez's total assets as $8,046,288 and her liabilities as $644,827, resulting in a net worth of $7.4 million.  The letter bears a signature in Klein's name and the date June 15, 2008.

77.     On November 17, 2010, Martinez was interviewed pursuant to civil lawsuit filed by Penn Mutual. Martinez stated that she met with individuals who offered her between $25,000 and $50,000 simply for applying for life insurance. She was told the policy would be owned and paid for by a third party, who would receive the benefits upon her death. Martinez never intended to purchase life insurance for herself, but was interested in the lump sum payment in this program. In 2008, Martinez and her husband had approximately $350,000 in assets and were not working in any capacity. Although Martinez began the process of applying for life insurance, she decided to stop the process before it was complete. She explained this to the third party who had been contacting her about the policy and believed the process was done. Although Martinez's signature appears on the signature page of the Penn Mutual life insurance application in her name, many details within the application are false.  She has never been self-employed.  She never intended to make annual premium payments of over $200,000 and did not have the ability to make such payments. She has no relationship with Bursey or the Charter Oak Trust. She does not have "above average prior investment experience" and she did not want any policy for estate planning purposes.  Martinez had no interest income or capital gains from trust assets and her net worth was nowhere near $7.4 million.

78.     Additionally, according to Martinez, she does not recall the names Waesche or Klein. Martinez does not employ any Certified Public Accountant and did not provide any

financial information to Klein or Waesche representing that her net worth was over $7 million.
Martinez has never had an estate tax analysis done and the analysis purporting her estate will
grow to $14.6 million is false.

79.     Although the Confidential Financial Statement appears to bear Martinez's
signature, the information contained in the statement is false.  The purpose of the insurance
policy was not for estate conservation for Martinez.  Martinez did not have an annual income of
$321,000 and her assets and liabilities are nowhere near what is listed on the statement.

***Joan M. Pennington Policy***

80.     On August 4, 2008, a life insurance policy packet for Joan M. Pennington
("Pennington") was faxed to Lincoln National Life Insurance Company ("Lincoln") from
Andrew Varner at Pacini & Company, a financial services firm that sold other policies that were
part of the Charter Oak Trust.  There is no employer listed on this application.  Pennington's
total assets are listed as $25 million.  Questions about the sale of the policy or premium financing
on the policy are answered NO.  The application bears signatures in the names of Pennington and
Robert Pacini ("Pacini") on July 15, 2008.

81.     On the Agent's Report, the purpose of Pennington's insurance is listed as "Estate
Planning."  The questions about a premium financing loan or funding from any person or entity
whose only interest in the policy is the potential for earnings are answered NO.  Pacini is the
only agent on the application, receiving 100% commission.  The form bears a signature in
Pacini's name, with the date July 15, 2008.

82.     On August 7, 2008, Pacini sent a letter to Lincoln's underwriting department
regarding Pennington.  The letter states that Pennington signed a 50-year lease on her ranch.

property for wind turbines, which will bring in approximately $6 million a year. According to the letter, the value of the ranch, the lease and their estate will total $25 million.

83.     On August 12, 2008, Pennington contacted Infolink, a company engaged by Lincoln to contact insureds regarding applications. During the call, Pennington stated she was retired and has been for twenty years. She also provided no earned or unearned income and did not state she was self-employed. She states she has $25 million in "other assets." Pennington also stated that she had not discussed selling the policy and that premium financing would not be used to pay premiums.

84.     On August 22, 2008, the Texas Secretary of State received a Certificate of Formation for Joan M. Pennington Investments, LLC. The documentation was sent by attorney Paul E. Martin, who shared the same address as Pacini & Company at the time. In July 2010, a Texas Franchise Tax Public Information Report was submitted to the Texas Secretary of State and bears a signature in the name of Pennington.

85.     On September 9, 2008, an Adoption Agreement was signed by Pennington on behalf of Joan M. Pennington Investments, LLC, stating that Joan M. Pennington Investments, LLC adopts, joins and agrees to participate in the Charter Oak Plan & Trust and contribute funds for the benefit of Pennington.

86.     On September 16, 2008, a life insurance policy application packet for Joan M, Pennington was faxed to Lincoln from Jenny Valedaserra of Benefit Plan Advisors. Included with the application packet was the Charter Oak Trust Declaration of Trust, which bears the signature of Bursey as President of Nova Group, Inc.

87.     On this more recent life insurance application, Pennington's employer is listed as Joan M. Pennington Investments, LLC, with Pennington as the President/Management. The

business address is the same as Pennington's home address. Her annual earned income is listed at $500,000 and her annual unearned income is $5.5 million. Her total assets and net worth are listed to be $29,057,000. Questions about any anticipated sale of the policy, or intended premium financing on the policy are answered NO. The application bears signatures in the names of Pennington, Bursey and Pacini.

88.    On the agent's report associated with the September application, the purpose of Pennington's insurance is listed as "Estate Planning." Again, the questions about the existence of a premium financing loan or funding from any person or entity whose only interest in the policy is the potential for earnings are answered NO. The agents who participated in the application are listed as Pacini (with 50% commission) and Westcott (listed as Charles J. Induddi, with 50% commission). The report bears a signature in the name of Pacini, dated September 9, 2008.

89.    Included with the application packet for Pennington is an Acknowledgement for Single-Employer 419(e) Welfare Benefit Plans. This form bears signatures in the names of Pennington and Bursey.

90.    On September 10, 2008, Varner sent a facsimile report to Lincoln that included the financial statement for Pennington. The statement is a one-page document that lists Pennington's net worth as $29,057,000, which includes $18 million in business interests. There is also an annual income of $6 million listed. The statement bears signatures in the name of Pennington and Martin. Martin's law firm is listed as Paul E. Martin, Attorney at Law.

91.    A Disclosure, Acknowledgement & Certification Agreement dated September 9, 2008, bears signatures in the names of Pennington and Pacini. The bottom of the form also

28

indicates that it was "accepted and agreed to" by Daniel Carpenter as "Chairman of Managing Member," and bears a signature in Carpenter's name.

92.     On September 24, 2008, $479,500.00 was deposited into the Grist Mill Capital Christiana account from a Ridgewood Finance, Inc., account at JP Morgan Chase Bank and was wired out the same day to the Charter Oak Trust account at PNC Bank.  On the same date, $479,500 was wired out from the Charter Oak Trust account at PNC Bank and sent to Lincoln for payment of Joan Pennington's premium.  On August 27, 2009, $305,151.87 was deposited into the Grist Mill Capital Christiana account from a Ridgewood Finance, Inc., account at JP Morgan Chase Bank and was wired out the same day to the Charter Oak Trust account at PNC Bank.  The next day, the same amount was sent from PNC Bank to Lincoln for payment of Pennington's premium.  On August 10, 2010, $19,499.37 was deposited into the Grist Mill Capital Christiana account from a Ridgewood Finance, Inc., account at JP Morgan Chase Bank. On August 11, 2010, the same amount was wired out to the Charter Oak Trust account at PNC Bank and then was sent from PNC Bank to Lincoln for payment of Pennington's premium.  On November 10, 2010, $49,276.08 was deposited into the Grist Mill Capital Christiana account from a Ridgewood Finance, Inc., account at JP Morgan Chase Bank. On November 12, 2010, the same amount was wired out to the Charter Oak Trust account at PNC Bank and then, on November 15, 2010, the same amount was sent from PNC Bank to Lincoln for payment of Pennington's premium.

**Alton Patton Policy**

93.     On November 19, 2007, a life insurance policy packet for Alton Patton ("Patton") was faxed to Lincoln from Andrew Varner at Pacini & Company.  There is no employer listed on this application.  Patton's total assets are listed as $5.265 million.  Questions about the intended

29

sale of the policy or the existence of premium financing on the policy are answered NO.  No "premium financing application supplement," required if the applicant intends to use premium financing, is included.   The application is bears signatures in the name of Patton and Pacini on November 14, 2007.

94.      On the Agent's Report, the purpose of Patton's insurance is listed as "Estate Planning."  The question about funding from any person or entity whose only interest in the policy is the potential for earnings is answered NO. The question about premium financing is not answered; however, no details are provided about financing, which is required if premium financing is planned.  Pacini is the only agent on the application, receiving 100% commission. The form bears a signature in Pacini's, with the date November 14, 2007.

95.      In an Adoption Agreement dated November 28, 2007 and bearing the signature of Patton on behalf of Associated Power Analysts, Inc, the business adopts, joins and agrees to participate in the Charter Oak Plan & Trust and contribute funds for the benefit of Patton.

96.      On December 5, 2007 a life insurance policy packet for Patton was mailed to Lincoln from Jenny Valedaserra of Benefit Plan Advisors.

97.      On the more recent Life Insurance Application, Patton's employer is listed as Associated Power Analysts, Inc with Patton as the President. His annual earned income is listed at $1.2 million and his annual unearned income is $200,000.  His total assets and net worth are listed to be $5.5 million. Questions about any intended sale of the policy or premium financing on the policy are answered NO. The application bears signatures in the names of Patton, Bursey and Pacini.

98.      On agents report associated with this more recent application, the purpose of Patton's insurance is listed as "Estate Planning."   Again, the questions about a premium

financing loan or funding from any person or entity whose only interest in the policy is the potential for earnings are answered NO. The agents who participated in the application are listed as Pacini (with 50% commission) and Westcott (listed as Charles J. Induddi, with 50% commission). The report bears a signature in the name of Pacini, dated November 28, 2007.

99.     Included with the application packet for Patton is an Acknowledgement for Single-Employer 419(e) Welfare Benefit Plans. This form bears signatures in the names of Patton and Bursey.

100.     A Disclosure, Acknowledgement & Certification Agreement dated November 28, 2007, bears signatures in the names of Patton and Pacini. The bottom of the form also indicates that it was "accepted and agreed to" by Daniel Carpenter as "Managing Member," and bears a signature in Carpenter's name with a date of December 11, 2007.

101.     On December 7, 2007 a life insurance policy packet for Patton was faxed to Lincoln from Ineke Murphy of Nova Group, Inc. The application, Agent's Report and Acknowledgement for Welfare Benefit Plans form appear the same as the documents mailed on December 5, 2007.

102.     On July 24, 2009, $45,382.00 was deposited into the Grist Mill Capital Christiana account from a Ridgewood Finance, Inc., account at JP Morgan Chase Bank. On the same date, $140,945.19, which included the $45,382.00, was wired out to the Charter Oak Trust account at PNC Bank. On the same date, $45,382.00 was wired out from the Charter Oak Trust account at PNC Bank and sent to Lincoln for payment of Patton's premium. On September 18, 2009, $69,057.79 was deposited into the Grist Mill Capital Christiana account from a Ridgewood Finance, Inc., account at JP Morgan Chase Bank and was wired to the Charter Oak Trust account at PNC Bank. On September 21, 2009, the same amount was sent from PNC Bank to Lincoln

for payment of Patton's premium. On December 11, 2009, $25,640.49 was deposited into the

Grist Mill Capital Christiana account from a Ridgewood Finance, Inc., account at JP Morgan

Chase Bank. On the same date, $89,640.49, which included the $25,640.49, was wired out to the

Charter Oak Trust account at PNC Bank and then $25,640.49 was sent from PNC Bank to

Lincoln for payment of Patton's premium. On June 17, 2010, $34,677.97 was deposited into the

Grist Mill Capital Christiana account from a Ridgewood Finance, Inc., account at JP Morgan

Chase Bank and was wired to the Charter Oak Trust account at PNC Bank. On June 18, 2010,

the same amount was sent from PNC Bank to Lincoln for payment of Patton's premium. On

September 15, 2010, $34,677.97 was deposited into the Grist Mill Capital Christiana account

from a Ridgewood Finance, Inc., account at JP Morgan Chase Bank. The next day, the same

amount was wired to the Charter Oak Trust account at PNC Bank and then was sent from PNC

Bank to Lincoln for payment of Patton's premium. On December 8, 2010, $34,677.97 was

deposited into the Grist Mill Capital Christiana account from a Ridgewood Finance, Inc., account

at JP Morgan Chase Bank and then was wired to the Charter Oak Trust account at PNC Bank.

On December 17, 2010, $34,677.97 was sent from PNC Bank to Lincoln for payment of Patton's

premium.

## Commissions

103.    As a result of selling insurance policies through the COT, insurance agents are

entitled to significant commissions. Your affiant is in the process of gathering commission data

for all policies sold in COT. To date, your affiant has learned that Lincoln has paid

approximately $13.6 million in commissions and Phoenix has paid out approximately $3.3

million on COT policies. Waesche sold 17 Phoenix policies and received $2.5 million in

commissions. Westcott sold 38 Lincoln policies and received $4.3 million in commissions. On

3 Lincoln policies under COT, Waesche and Trudeau receive commissions under TPG Group, Inc., totaling over $300,000. TPG Group also separately received one commission for a Lincoln policy within COT, totaling approximately $22,000.

104.    For all applications submitted by Pacini, Pacini shared the commissions with Westcott, typically split evenly with both receiving 50% commissions. On two policies, both for insured George Sanders, Westcott received 50% commission, Pacini received 25, and another agent, Brad Kellam, received 25%. In total, for the 16 policies sold by Pacini, Pacini received approximately $1.6 million in commissions. For these same policies, Westcott received approximately $1.87 million and Kellam received approximately $89,000.

### Policy Sales

105.    As indicated above, of the seventy-one policies that have been reviewed by your Affiant and that have passed the contestability period, thirty-five have already changed ownership. Of those thirty-five to change ownership, twenty-three have been transferred to M&T Bank as "security intermediary," six have been transferred to Avalon I Trust, and six have been transferred to Life Insurance Fund Elite, a fund managed by ISM Advisors. In addition, there appear to be five more Charter Oak policies that ISM is in the process of purchasing.

106.    ISM Advisors ("ISM") first became known to your Affiant in March 2011. It is an investment management firm that manages and has an ownership interest in a life insurance settlement fund called Life Insurance Fund Elite ("LIFE"). Through information provided by ISM, your affiant has learned that since late 2010, ISM has been in the process of purchasing a number of life insurance policies from Trudeau, who represented himself as a principal at Avon Capital ("Avon") and President of Benistar, for inclusion in LIFE. Trudeau offered these policies in exchange for $35 million cash and a $25 million investment into LIFE. It was made

known to Trudeau that ISM was under a deadline in late 2010 to purchase a certain number of insurance policies or else would lose its credit facility.

107.    Over the course of negotiating the sale of policies to ISM, Trudeau has changed the policies included in the sale on multiple occasions, even after ISM and Avon closed on the sale on November 15, 2010.  Additionally, he has purported to own all the policies offered, but documentation shows the owner's names to be individuals or entities not associated with Trudeau.  ISM received some information that Trudeau is selling policies to other investors as well, as they received notice of two ownership change forms on a policy they had "purchased" from Trudeau.

108.    Among the policies Trudeau offered for sale were a number of COT policies. Although Trudeau provided a spreadsheet with information about the policies for sale, ISM did not receive documentation on many of the policies.  Additionally, background information about the Charter Oak Trust itself was not provided to anyone at ISM.  Nor did Trudeau explain what authority Avon had to sell policies that were owned by Charter Oak, or for that matter any number of other trusts or entities that owned the policies that Trudeau was attempting to sell.

109.    During the course of negotiations, ISM employees have on multiple occasions visited Trudeau's office, which is located at SUBJECT OFFICE A.   Moreover, Robinson was present at SUBJECT OFFICE A when individuals from ISM came to review information on the policies offered for sale.  Robinson claimed to have nothing to do with the policies or the sale. However, Robinson's name has been on documents included with the policies and information has shown him to be a principal of Avon as well.

110.    In addition to ISM, it appears an entity called "Avalon I Trust" has also been the destination of six other COT Policies.  On February 22, 2011, Lincoln received a fax regarding

34

the change of ownership for 5 policies within the COT, including Pennington's policy. On the Life Ownership Change Form for all five policies, the current owner is listed as the COT, with an email contact address of dtrudeau@benistar.com. The new owner is listed as Avalon I Trust, with Wells Fargo Bank as the Trustee. All the Life Ownership Change forms are signed by Bursey on February 9, 2011 and by Rebecca Chapman from Wells Fargo, on February 17, 2011. On March 14, 2011, Lincoln faxed confirmation of the change of ownership on Pennington's policy to Wells Fargo Bank. Your affiant is still investigating the origin and nature of the Avalon I Trust.

111.    Alton Patton's policy, discussed in the prior section, appears to have been sold twice by Charter Oak. On February 24, 2011, Lincoln received a fax regarding the change of ownership for Patton's policy within the COT. On the Life Ownership Change Form, the current owner is listed as the COT. The new owner is listed as LIFE, with Wells Fargo Bank as the Trustee. The form is signed by Bursey on February 11, 2011 and by Christopher Young and Michael Mantich, for Wells Fargo, on February 23, 2011. On March 10, 2011, Lincoln received a fax regarding the change of ownership for Patton's policy within the COT. On the Life Ownership Change Form, the current owner is listed as the COT, with an email contact address of dtrudeau@benistar.com. The new owner is listed as Avalon I Trust, with Wells Fargo Bank as the Trustee. The form is signed by Bursey on February 9, 2011 and by Rebecca Chapman from Wells Fargo, on March 10, 2011. Your affiant is still investigating to whom the policy was actually legally sold, if anyone.

112.    As noted above, 23 COT policies that have passed their contestability period have been transferred to M&T Bank as "security intermediary." For example, on December 9, 2010, Phoenix Life Insurance received via fax a Designation of Owner form for the Knowles life

insurance policy. The current owner of the policy is listed as COT and the new owner is M&T

Bank, as security intermediary.  Bursey signed the form for Charter Oak Trust on December 8,

2010.  Patrick Wood signed for M & T Bank on December 9, 2010.

## PART IV.  RECORDS LOCATED AT THE SUBJECT OFFICES

113.    Based on my experience as a criminal investigator, I know people maintain the

following records and documents (including those in Attachment D), among others, in locations

they feel are safe from the scrutiny of law enforcement, but still under their control:

a.      records relating to their business operation;

b.      records of income and expenditures;

c.      records of the accumulation of assets and liabilities, including real and

personal property, mortgages and other loans;

d.      records of banking transactions, including but not limited to deposits,

withdrawals and loan activity;

e.      records of mailings either by U.S. mail or private delivery services;

f.      records of correspondence and communications with other business

employees and outside businesses and individuals; and

g.      laptop and desktop computer records.

114.    Based on my training and my experience and other knowledgeable persons, I

know that it is common in the business community for companies and sole proprietorships to

maintain journals, ledgers and other records showing the receipt and disposition of funds.  In my

experience in dealing with these types of records, your affiant believes that the flow of funds into

and out of a company or sole proprietorship can be tracked by tracing the paper trail that is

created by entities into the business records and bank accounts and by documents received or

prepared in connection with each transaction. These records include such things as:  general journals, cash receipts journals, cash disbursements journals, and sales journals; general and subsidiary ledgers, accounts receivable, accounts payable, and closing ledgers, bank statements, deposit slips and cancelled checks for any and all bank accounts; receipts and invoices for all expenditures;

115.    Based on my training and experience, I know that businesses maintain records of correspondence both within the business and with other individuals and companies, on computer and in hard-copy. These records include email correspondence, letters, memos, and addresses and telephone numbers of business associates and other persons and entities.  Such records may also be kept and maintained with computer hardware equipment and software, such as disks, magnetic tapes, programs, and computer printouts.

116.    Based on the information obtained during the course of the investigation, and on the training and experience of myself, and the other criminal investigators involved in this matter, I believe that records relevant to the investigation of mail fraud, wire fraud, and insurance fraud by Carpenter, Bursey, Waesche, Robinson, Westcott, Pacini, Varner, Martin, Trudeau and other associated individuals are present at SUBJECT OFFICE A, SUBJECT OFFICE B, SUBJECT OFFICE C, and in the TARGET MEDIA.

117.    Your affiant is aware that target Robinson is, in addition to being a principal of some of the SUBJECT COMPANIES, also an attorney.  Your affiant has obtained a press release from Benistar in which Robinson is referred to as "vice-president and general counsel for BENISTAR."  However, the documents referenced herein that were signed by Robinson appear to be signed in his capacity as a principal for some of the SUBJECT COMPANIES, and not as an attorney.  Moreover, your affiant is unaware of any law office of Robinson's within any of the

37

SUBJECT OFFICES.  If during the search your affiant or a member of the search team identifies files that appear to contain privileged communications, those files will be sealed off from the investigative team and preserved for review by a "filter team" at a later time.

## PART VI.  COMPUTER RECORDS

118.    Based on my training and experience, and on conversations I have had with other law enforcement officers, I am familiar with the practices and methods of person who commit insurance fraud, and their reliance on computer technology to commit these criminal offenses. Such individuals often create and maintain records relating to the conduct, including correspondence and memos, receipts, telephone records, bank account and financial information, notes and personal documents, and names of victims and coconspirators on electronic databases on computers, stored in electronic or magnetic form. Furthermore, users of computer equipment often create and maintain records of computer ownership and subscriptions to internet services. Based on this information, on the facts set forth above, and the more specific information provided below, there is probably cause to believe that computer-related equipment that may contain evidence of the crime described above may be found at the target location.

119.    The investigation to date has shown that Robinson, Bursey, Waesche and others at the SUBJECT COMPANIES, and individuals at Ridgewood Finance and Ridgewood Finance II, utilize computers to facilitate this fraud scheme.   Robinson, Bursey, Waesche and associates communicate via email with each other and other businesses, and have used email in furtherance of the fraud scheme. In addition, documents obtained from Lincoln, PHL Variable Insurance Company, and Penn Mutual Life Insurance Company show Robinson, Bursey, Waesche and others communicating via email.

120.    On May 11, 2007, Charles Collier of Ridgewood Finance sent an email to Robinson (using address robinsonesq@aol.com), Trudeau (using address dtrudeau@benistar.com), Sheila O'Grady (using address sogrady@benistar.com), and Bursey (using address wbursey@benistar.com) regarding the revised funding procedure between Ridgewood and Grist Mill Capital. The funding procedures detail the information Grist Mill Capital is to provide to Ridgewood regarding life insurance premiums, including illustrations, status reports and policy numbers.  The January 2007 procedures also state that Ridgewood will issue commitment letters via email to Kathy Kehoe (kkehoe@benistar.com) and Bursey (wbursey@bensistar.com). The revised procedures, as of May 2007, list Bursey and O'Grady (sogrady@benistar.com) as contacts. The funding procedures further state that if there is a deficiency in the closing packet, Ridgewood will use email to inform Robinson (robinsonesq@aol.com). Although the original procedures include Kehoe (kkehoe@benistar.com) as a contact, the revised does not. The Contact List attached to the original funding procedures list Trudeau (dtrudeau@benistar.com) and Kehoe (kkehoe@benistar.com) as BASI employees, Bursey (wbursey@benistar.com) as a Charter Oak Trust representative, and Robinson (robinsonesq@aol.com) as a Grist Mill Capital

representative.  The Contact List attached to the revised procedures replace Kehoe with O'Grady (sogrady@benistar.com) and list Bursey as an employee of BASI rather than a representative of Charter Oak Trust.

121.    On September 3, 2008, Waesche, using email address EWaesche@benistar.com, sent an email to Penn Mutual Life Insurance that included financial information for client Teresa Martinez.  Evidence received in this case has shown the financial information provided by Waesche to be false. Waesche copied Jenny Valedaserra on this email, with the email address, Jvaledaserra@Benefitplanadvisors.com.  Valedaserra is former employee of BASI.

122.    On July 14, 2008, Waesche, using email address ewaesche@benefitplanadvisors.com, sent an email to Penn Mutual Life Insurance requesting that the Miriam Knobloch policy be issued without a background call being done on Knobloch, due to an alleged mistake by the background company.

123.    On July 1, 2008, Waesche, using email address ewaesche@benefitplanadvisors.com, emailed Phoenix Life insurance regarding the outstanding premium payment for Johnny Robertson's policy within the Charter Oak Trust.  Waesche copied Valedaserra at address jvaledaserra@novaplans.com in this email.  The email requested additional time to send the initial premium payment for Robertson's policy and stated, "the client wants to send $300,000."  The email did not mention third party financing, which was used to pay this premium.

124.    On May 5, 2008, Waesche, using email address ewaesche@benefitplanadvisors.com, emailed Phoenix Life insurance regarding the discrepancy between the financial information on the application for Luella Mae Paulsrud and the information provided by Paulsrud to underwriters.  Waesche claimed that Paulsrud was

40

instructed not to provide financial information over the phone, so she understated her financial status. Waesche also attached a financial statement allegedly prepared by William Klein. There is reason to believe that Waesche's statements in the email and the financial statement are fraudulent.

125.     During the application process, Waesche and Valedaserra communicated with life insurance companies often via email. Phoenix Life Insurance requested information from them via email and Waesche and Valedaserra responded through email.

126.     Based on the numerous documents reviewed in this case, as well as information obtained during the course of the investigation, I am aware that Waesche and others at the SUBJECT COMPANIES, and individuals at Ridgewood Finance and Ridgewood Finance II, have utilized email accounts to correspond with insurance companies.

### Execution of the Warrant as to Computer Systems and Storage Devices

127.     Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I know that electronic data can be stored on a variety of computer systems and storage devices. I also know that during the search of the premises, it is rarely possible to complete an on-site examination (and in some cases even images) of computer systems and storage devices for a number of reasons, including the following:

   a.     Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

   b.     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover

"hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

      c.     The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 250 million pages of data, which, if printed out, would result in a stack of paper over ten miles high. Further, a 500 GB drive could contain as many as approximately 250 full run movies or 450,000 songs.

      d.     Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

    128.    Due to the volume of data at issue and the technical requirements set forth above,

it may be necessary for the above-referenced computer systems and storage devices to be seized

and analyzed subsequently by a qualified computer specialist in a laboratory setting. Under

certain circumstances, however, some types of computer systems and storage devices may be

imaged and a copy of the data may be seized, thus eliminating the need for its removal from the

premises. Your affiant requests permission to either seize or image (copy) computer media in

consultation with computer forensic analysts present at the time of the execution of the requested

warrants.  A determining factor is whether a particular device can be more readily, quickly, and thus less intrusively, analyzed off-site, with due consideration given to preserving the integrity of the evidence.  This, in turn, is often dependent on the size of the computer systems and storage media to be analyzed; and this is frequently dependent upon the particular type of computer system or storage device involved.

129.    Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I am aware that forensic analysis of computer systems and storage devices taken from the premises commonly require agents to seize most or all of a computer systems and storage devices, in order for a qualified computer expert to retrieve the data accurately in a laboratory or other controlled environment.  Therefore, in those instances where computer systems and storage devices are removed from the premises, in order to retrieve data properly, the agents must seize all of the computer systems and storage devices.  If, after imaging and inspecting the computer systems and storage devices, it becomes apparent that these items are no longer necessary to retrieve and preserve the data as evidence, and are not otherwise seizeable, such equipment and/or materials will be returned within a reasonable time.

### Forensic Analysis of Computers and Electronic Data

130.    The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying the file directories and any individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence authorized for seizure by the warrant); conducting a file-by-file review of the data;

examining all the structured, unstructured, deleted, and free space data on a particular piece of media; opening or reading the first few pages of each file in order to determine their precise contents; scanning storage areas to discover and possibly recover deleted data; scanning storage areas for deliberately hidden files; and performing electronic key-word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation. The forensic analysis of the electronic information seized during the search can take weeks or months, depending on the volume of data stored in the computers.

## PART VII:  PRIOR SEARCH WARRANT AND PROPOSED PROCEDURES FOR SCREENING TARGET SEIZED MEDIA FOR POTENTIALLY ATTORNEY-CLIENT PRIVILEGED MATERIAL

131.    On April 20, 2010, special agents with the Criminal Investigation Division of the Internal Revenue Service ("IRS-CID") executed a search warrant at SUBJECT OFFICE B, 100 Grist Mill Road in Simsbury, Connecticut. The search warrant was authorized by the Honorable Thomas P. Smith, United States Magistrate Judge for the District of Connecticut. The United States Attorney for the Eastern District of Wisconsin obtained the search warrant on behalf of a federal grand jury in the Eastern District of Wisconsin. The Wisconsin grand jury had been investigating and continues to investigate allegations of criminal wrongdoing relating to the promotion of so-called 419 welfare benefit plans. The Wisconsin grand jury's investigation has been ongoing since 2008.  The Wisconsin investigation focuses primarily on the use of 419 Plans sold through Nova Benefit Plans, LLC, in which Bursey and other individuals encourage plan participants to defraud the United States by claiming minor injuries to be permanent disablement and disfigurement, thereby improperly qualifying for favorable tax treatment.

44

132.    In the course of the execution of the search warrant, the IRS-CID seized numerous boxes of hard copy documents (which is the subject of an application in the Eastern District of Wisconsin made contemporaneously to this application) and made perfect copies of certain computer drives and media located in SUBJECT OFFICE B (the TARGET SEIZED MEDIA), as follows, and as identified by unique control numbers assigned by the IRS following the search:

a.    RAID ARRAY in a Dell Power Edge 2600, with Serial Number 722PB51, IRS Control Number B71

b.    RAID ARRAY in a Dell Server, with Serial Number 7YTNQB1, IRS Control Number B72

c.    Dell D600 Laptop Computer, Seized from Cube Number 38, IRS Control Number B73

d.    Dell D800 Laptop Computer, Service Tag 1FRKG61, IRS Control Number B74

e.    Dell D610 Laptop Computer, Service Tag DQ21981, IRS Control Number B75

f.    USB Thumb Drive, Seized from Cube 33, IRS Control Number B76

g.    Adaptec External Drive, IRS Control Number B77

h.    Hard Disk Drive in Dell Optiplex Computer, Seized from Daniel Carpenter's Office, Service Tag GG7Z551, IRS Control Number B78

i.    Hard Disk Drive in Dell Latitude Computer, Seized from Daniel Carpenter's Office, Service Tag HF95K11, IRS Control Number B79

j.      Dell Optiplex Desktop Computer Model GX520, Seized from Molly

Carpenter's Office, Service Tag 424PL91, IRS Control Number B80

k.      Dell Latitude D830 Computer, Seized from Cube 34, IRS Control Number

B81

l.      Generic computer drive in an Antec Box labeled "Benistar 508", IRS

Control Number B82

m.      Dell Latitude 630 Computer, IRS Control Number B83

133.    The TARGET SEIZED MEDIA are currently in the custody of the IRS-CID,

located at 150 Court Street, Room 314, New Haven, Connecticut ("IRS-CID New Haven").

Your affiant proposes to seize the TARGET SEIZED MEDIA on the premises of the IRS-CID

New Haven, make perfect copies of each of the images, and then return the original images to

the custody of IRS-CID New Haven.  Your affiant then proposes that a search be conducted of

the copies of the TARGET SEIZED MEDIA as set forth herein, for the items in Attachment D.

134.    Following the IRS-CID search, certain of the TARGETS asserted, among other

things, that the TARGET SEIZED MEDIA and the hard copy material contained items protected

by the attorney-client privilege.  On March 11 and March 22, 2011, the Honorable Lynn

Adelman, United States District Judge for the Eastern District of Wisconsin, issued orders that

permitted the use of a so-called "filter team" by the United States Attorney's Office for the

Eastern District of Wisconsin (USA-WIE) and the IRS-CID to consider claims of privilege by

the TARGETS.  In sum and substance, the Orders called for the review by a team of Government

attorneys and agents not connected to the IRS-CID investigation ("the filter team").  With regard

to the hard copy evidence, if documents were deemed relevant by the filter team, they would be

scanned by the team and then shipped to Halloran and Sage, LLP, lawyers for the TARGETS

which would then review the materials for privilege.  If the documents were deemed irrelevant, they would be shipped directly to BASI at SUBJECT OFFICE A.  To date, your affiant understands that more than one hundred boxes have been shipped to Halloran and Sage, but that the remainder are still with IRS-CID in Wisconsin.  With regard to electronically stored information ("ESI") in the TARGET SEIZED MEDIA, the order called for the TARGETS to initially review the media used by Carpenter and Bursey, and to create a log of privileged materials, and then to provide that log to the filter team for review.

135.    Your affiant does not have a current reason to believe that the items sought in Attachment D and found in the TARGET SEIZED MEDIA will be protected by the attorney-client privilege.  Because the records to be seized should relate primarily to the origination and sale of insurance policies, there should be little if any material seized falling within the attorney-client privilege.  Moreover, any such material will likely not be protected by the privilege under the crime-fraud exception to the attorney-client privilege due to the fact that the communications at issue would likely have been made in furtherance of criminal activity.  However, given the assertion by the TARGETS of the privilege and Judge Adelman's order, and in an abundance of caution, the Government will solicit from the TARGETS a list of files on the TARGET SEIZED MEDIA that they contend contain attorney-client privileged material.  Your affiant understands that copies of the TARGET SEIZED MEDIA have already been provided to the TARGETS.  Any material for which the claim of privilege is not made will be forward to the investigative team.  Any material that the TARGETS claim is privileged will be initially reviewed only by agents who will not be assigned to the investigation or prosecution of this matter (the "Connecticut filter team").  In addition, an Assistant United States Attorney not assigned to the

investigation or prosecution will be designated to provide advice to the agents and personnel conducting the search and address issues as they arise.

136.    The Connecticut filter team will not reveal any of the documents, materials, and data searched to any member of the investigation/prosecution team unless in accordance with the following procedure set forth below, recognizing, however, that if defense counsel fails to meet the listed deadlines, the government will take alternate reasonable steps to address privilege concerns while providing relevant materials to the investigative team.

137.    Before disclosing any material to the investigative team, the designated Assistant United States Attorney will provide counsel for the TARGETS thirty calendar days in which to review the TARGET SEIZED MEDIA and to assert any claim that they constitute materials protected by the attorney-client privilege. If an agreement cannot be reached concerning the materials, the designated Assistant United States Attorney will provide counsel for the TARGETS an additional 3 calendar days in which to file with the Court any claims of privilege. The designated Assistant United States Attorney will file a response to any claim of privilege, and any documents, materials, or data for which a claim is asserted will be made available to the Court. Any documents, materials, or data for which a claim is not raised will be provided to the investigation and prosecution team.

138.    If, during the search or the proceedings described above, the search team or the designated Assistant United States Attorney determines from any documents, materials and data recovered to which a claim of privilege could be or has been raised that additional measures need to be taken to locate, obtain, and preserve fruits, instrumentalities, or evidence of criminal activity, they will take the necessary steps to do so. To the extent practicable, the search team

and designated Assistant United States Attorney will not disclose this derivative evidence until the procedure described above have been completed.

## PART VIII:  NEED FOR SEALING

139.    I request that the search warrant applications and this affidavit be sealed.  The investigation of the criminal activities of Carpenter, Bursey, Waesche, Trudeau, Pacini, Martin, Varner, Westcott and Robinson is ongoing.  Premature disclosure of the contents of this affidavit could result in the destruction of evidence, and could frustrate this investigation by alerting the targets of the investigation to the nature of the probe, the techniques employed, and the evidence developed to date, and by limiting the possible use of the grand jury to develop further admissible evidence and by limiting the ability to conduct other search warrants that may be necessary.

## PART IX:  CONCLUSION

140.    There is probable cause to believe, and I do believe, that during the years 2006 through the present, Carpenter, Bursey, Robinson, Waesche, Pacini, Martin, Varner, Westcott and Trudeau, and others known and unknown, willfully conducted a fraud scheme to fraudulently obtain life insurance policies, and used interstate wires and mail to fraudulently obtain the policies, in violation of 18 U.S.C. §§ 1033, 1341 and 1343.

141.    There is probable cause to believe, and I do believe, that the items described in Attachment D to this Affidavit are presently located at the offices of Benistar, Avon Capital, LLC and US Benefits Group, 300 First Stamford Place, Suite 201, Stamford, Connecticut (SUBJECT OFFICE A), and that such items constitute evidence, fruits and/or instrumentalities of violation so 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1033 (insurance fraud).

142.     There is probable cause to believe, and I do believe, that the items described in Attachment D to this Affidavit are presently located at the offices of BASI, Grist Mill Holdings, LLC, Charter Oak Trust, Charter Oak Trust 2009, US Benefits Group, Caroline Financial Group, Inc., TPG Group, Inc. Grist Mill Capital, LLC, Avon Capital, LLC, and Nova Group, Inc,  100 Grist Mill Road, Simsbury, Connecticut (SUBJECT OFFICE B), and that such items constitute evidence, fruits and/or instrumentalities of violation so 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1033 (insurance fraud).

143.     There is probable cause to believe, and I do believe, that the items described in Attachment D to this Affidavit are presently located at the office of Caldwell Funding Corporation and Ridgewood Finance II LLC (SUBJECT OFFICE C), 1055 Washington Boulevard, 8th Floor, Stamford, Connecticut, and that such items constitute evidence, fruits and/or instrumentalities of violation so 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1033 (insurance fraud).

144.     There is probable cause to believe, and I do believe, that the items described in Attachment D to this Affidavit are presently located in the TARGET SEIZED MEDIA, and that such items constitute evidence, fruits and/or instrumentalities of violation so 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1033 (insurance fraud).

145.    Wherefore, your affiant respectfully requests that warrants be issued authorizing searches of the entire premises of SUBJECT OFFICE A, SUBJECT OFFICE B, and SUBJECT OFFICE C, as well as the entirety of the TARGET SEIZED MEDIA, for the items described in Attachment D and authorizing the seizure of all such items, which constitute fruits, evidence, and/or instrumentalities of violations of 18 U.S.C. §§ 1033, 1341, and 1343.

Lynn E. Allen
Special Agent
U.S. Department of Labor,
Office of Inspector General

Sworn to before me this 25th day of May 2011.

/s/ Judge Joan G. Margolis

JOAN G. MARGOLIS
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## PLACE TO BE SEARCHED

**300 First Stamford Place, 201
Stamford, Connecticut**

The entire premises of the office property located at 300 First Stamford Place, 201, Stamford, Connecticut. First Stamford Place is a three-building, 810,000-square-foot multi-tenanted office complex, located at I-95's exit 7, adjacent to the Stamford Transportation Center. 300 First Stamford Place is a glass enclosed office building located at the corner of Greenwich Avenue and First Stamford Place. The main entrance to the building has "300" over and to the right of the doorway. The elevators to access Suite 201 are on the Eastern side of the building. Suite 201 is on the second floor of the building, situated on the Northeastern side of the building. The office occupies approximately 7,200 square feet. The office entry is a large glass door. Listed on the glass in white letters is Benistar, Avon Capital and US Benefits Group. A photograph of the building entrance is attached as Exhibit 1.

## ATTACHMENT D

## DESCRIPTION OF ITEMS TO BE SEIZED

For the period of 2006 through the present, all of the following items or records, whether in paper, electronic or other form, relating to Daniel Carpenter, Jack E. Robinson, Donald Trudeau, J. Edward Waesche, Wayne Bursey, Charles Induddi Westcott, Robert Pacini, Andrew Varner, Paul E. Martin, Grist Mill Capital, LLC, Grist Mill Holdings, LLC, Benefit Plan Advisors, LLC, TPG Group, Inc., Caroline Financial Group, Nova Group, Avon Capital, LLC, the Charter Oak Trust Welfare Benefit Plan, the Charter Oak Trust, and the Charter Oak Trust 2009:

    a.    All books and records, including all general ledgers, cash receipts journals, cash disbursement journals, petty cash journals, bank statements, passbooks, cancelled checks, check stubs or registers, deposit tickets, deposit receipts, cashier's checks, money orders, wire transfer documents, invoices, written estimates, receipts, billing statements, contracts, agreements, customer ledger cards, purchases journals, advance payment ledgers, accounts payable ledgers, accounts receivable ledgers, correspondence, memoranda and documents;

    b.    any and all IRS forms and/or U.S. Treasury forms to include Annual Return/Report of Employee Benefit Plan Form 5500, Federal income tax returns, partnership returns, payroll tax returns, Forms W-2, and Forms 1099;

    c.    copies of federal and state income tax returns, including amended federal and state tax returns, as well as any and all records used in, or resulting from, the preparation of federal and state income tax returns;

    d.    records of income and expenses, such as profit and loss statements, financial statements, balance sheets and income and expense journals;

    e.    records involving payments from employers, or from any source, into the Charter Oak Trust or Charter Oak Trust 2009;

    f.    records associated with all insurance policies that were owned at any time by the Charter Oak Trust, whether or not they were subsequently transferred;

    g.    records involving loans, lines of credit, payments, settlement agreements or any financial transactions from Ridgewood Finance, Inc. and/or Ridgewood Finance II, LLC to any of the above entities or related businesses;

h.      correspondence between Waesche, Robinson, Carpenter, Bursey, Westcott, Pacini, and/or Trudeau and/or any other business entities or individuals regarding all payments, debts, withdrawals, loans, new policies, transfers of policies, or other activity involving the Charter Oak Trust or Charter Oak Trust 2009 (whether in paper or electronic format and stored on any computers or computer networks or servers), such as letters, memoranda, emails, mailings, and envelopes.;

i.      all records in whatever form of transfers of ownership of insurance policies;

j.      bank records, including but not limited to cancelled checks, cashier's checks, money orders, statements, deposit tickets, and withdrawal;

k.      bank loan records, including but not limited to loan applications and loan agreements, notes, certificates of deposit, payment records, mortgage statements, mortgage applications, broker accounts, notes receivable, notes payable, stock certificates, account statements, interest and dividend reports, and account activity reports;

l.      documents regarding debts owed and monies due from any of the above-mentioned entities or persons, including bills, foreclosure notices, and past due statements;

m.      documents and records relating to Charter Oak Trust's relationship with any of the above-mentioned entities or persons, including Trust Agreements, Plan Documents, Adoption Agreements, Insurance Policies, Invoices, Payments, Commission Reports, Loan requests, Contracts, and Complaints;

n.      documents and records relating to Charter Oak Trust 2009's relationship with any of the above-mentioned entities or persons, including Trust Agreements, Plan Documents, Adoption Agreements, Insurance Policies, Invoices, Payments, Commission Reports, Loan requests, Contracts, and Complaints;

o.      records, in whatever form, of personal and business activities relating to the operation and ownership of the computer systems, such as telephone records, notes, books, diaries and reference materials;

p.      records, in whatever form, pertaining to accounts held with Internet Service Providers or of Internet use;

q.      In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize the following items for off site review:

   i.      Any computer equipment and storage device capable of being used to commit further, or store evidence of the offenses listed above;

56

ii.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

iii.  Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

iv.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

v.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data;

vii.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data; and

viii.  Files, records, programs, logs, electronic communications, scanning programs, financial records, hacking software and router configuration software.

NOTE: As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including electronic media;

## **ATTACHMENT C**

## **PLACE TO BE SEARCHED**

### **1055 Washington Boulevard, 8th Floor**
### **Stamford, Connecticut**

One of two suites on the 8th Floor of the office building located at 1055
Washington Boulevard, Stamford, Connecticut. 1055 Washington Boulevard is a
nine story office building opposite of Whitaker Place with an attached parking
garage. SUBJECT OFFICE C has its entrance on the east side of the building,
facing west.  The entrance to SUBJECT OFFICE C is wooden, with a glass
partition next to it bearing the name "Caldwell Funding Corporation."

## ATTACHMENT B

## PLACE TO BE SEARCHED

**100 Grist Mill Road**
**Simsbury, Connecticut**

The entire premises of the office property located at 100 Grist Mill Road, Stamford, Connecticut. 100 Grist Mill Road is a large, single story office building. The lower portion of the building consists of red brick and window, while the upper portion consists of horizontal gray siding.  The property is accessed by a short driveway off of Grist Mill Road. At the bottom of the driveway is a red brick structure with a sign attached to it that says, "100 GRIST MILL ROAD." At the top of the driveway, as you approach the parking lot, is a wooden sign that reads, "DIRECTORY, ENTRANCE 1, BENISTAR." There is no signage on the exterior of the building itself. A photograph of the office building is attached as Exhibit 2

EXHIBIT 1

PHOTOGRAPHS OF THE BUILDING CONTAINING SUBJECT OFFICE A,
300 FIRST STAMFORD PLACE, STAMFORD, CONNECTICUT



EXHIBIT 2

PHOTOGRAPH OF SUBJECT OFFICE B,
100 GRIST MILL ROAD, SIMSBURY, CONNECTICUT



EXHIBIT 3

PHOTOGRAPH OF SUBJECT OFFICE C,
1055 WASHINGTON BOULEVARD, STAMFORD, CONNECTICUT

